I think I can boil the issue in this case down to a fairly narrow issue, and I did that after reading through all the cases, mainly the cases out of the Ninth Circuit that deal with the emergency doctrine. In this case, we're dealing with the decision of the police to enter a hotel room through a window based on a four-day-old missing persons report. The person had been gone from her residence for approximately six days. Her mother had called into the police department, not 911, not the dispatch asking for immediate assistance, but reported it to the police as a missing persons report two days after she had been missing. And I think, or not missing. The record doesn't show what caused that involuntary word to be added to the report. Not at all. In fact, Sergeant Tolma stated at the hearing he didn't know what it meant, called dispatch. They didn't know what the word involuntary meant. As far as we know, it could have meant the mother didn't want her to go. But the report, if I'm recalling it, did indicate it had the word suicidal in it, and it had the word drugs, and it had prostitution. So it had some association with those three elements in addition to her being missing. It signified certain factors that were involved in the missing persons report, but when you go to the missing persons report itself, it really describes in detail what the mother was really concerned about was that she left with some unknown person in a hatchback vehicle and hadn't heard from her for days. The guy was connected to somebody who was in jail for murder, and that she had called her saying, I'm hallucinating, and tweaking out, and I have a gun in the house. No indication that the gun was taken with her. So when you read the contents of the missing persons report, those are just what was contained in the missing persons report was a signification that said risk factors, not that these things were actually occurring. And I think that's important in this case because as I read through the Ninth Circuit cases, beginning with Russell, I submitted a brief letter or a supplemental letter to the court in February, I believe, talking about the Russell case. In that case, the police responded immediately to a 9-1-1 call. So this was a 9-1-1 call asking for immediate assistance. In the Martinez case, which, and excuse me, Russell's at 436, Fed Third, 1086. And then there's the United States versus Martinez case, which is at 406, Fed Third, 1160. Again, that was a 9-1-1 call asking for immediate assistance on a domestic violence call. The Brooks case, which was authored by Judge Gould, which is at 367, Fed Third, 1128. Again, that's a 9-1-1 call on a domestic disturbance. And that case is, I think Brooks is important because it says what the standard is, is that in order to determine whether the police have a right to go in, there has to be a fair probability or substantial chance that what they believe is the emergency is actually occurring. And in this case, what you have is a hotel room occupied by somebody with a do-not-disturb deadbolt engaged and not answering the door when the police knock on the door and announce that they're the police. It's obviously somebody in the room who doesn't want to be disturbed. Not obviously somebody. The room was taken and registered in the name of Tanya Selke, right? Correct. So they had reason to believe that it was Tanya Selke who was in the room, right? I would agree with that. That's not a name that somebody else would take as a pseudonym like James Jones, right? I completely agree with that. Yes. If they have reason to believe that a missing person is in the room who may be suicidal, is that enough for the emergency doctrine? I don't believe in this case, Your Honor, because the police are not responding to an urgent call by a father like was in the Martin v. Oceanside. The call, the report by the mother is to the police department not asking for immediate assistance, not saying these things are immediately apparent with her daughter, but saying I haven't seen my daughter for two days and here's what she said two days ago, with a report that wasn't asking them for immediate assistance to go out and look for her daughter. It was simply a report that my daughter's out there and here are some of the things that she has gone on in her life. You don't think that a mother reporting to the police that her daughter is suicidal and using drugs and is engaged in prostitution is a request for immediate assistance? Your Honor, I don't know if that's what she reported, because the narrative of that police report doesn't say that's what she reported. What it had in there was risk factors. What her report to the police was was that narrative where she talked about going to the house because her daughter called and said I'm hallucinating. Did the police have the full narrative or just the name and the three words? They had that screen and I attached that to appendix. I believe it's appendix B to my opening brief. It was an exhibit that was admitted at the hearing. So what the police had in the patrol car is reflected in appendix B to my opening brief, and it said suicidal, drug use, prostitution. But what also was in that was the phone number to the police records department where they could have called the police and got more detail on what the missing persons report was all about. Sergeant Thomas said, well, that's not what we normally do. But certainly in a situation like this where it's not a call for immediate assistance, in fact, the manager didn't give the police any information that Ms. Selke was acting abnormal or in any way suicidal or on drugs at the time they met with the hotel manager. So they had ways in which they could have developed this without deciding at that moment to open the curtain and create an exigency with Ms. Eyinger who ran to the bathroom. So I think it really does boil down to as to what the difference between this case is that in each of the cases that are cited in our briefs are the police officers responding immediately to the information that is given to them either through 911, through dispatch, or as in the Bradley case dealing with the 9-year-old boy. It's so different than a case here dealing with a 30-year-old adult who decides that she doesn't want to talk to her mother. It's so different because you have a 9-year-old, you have the police at the home arresting the mother, knowing that the 9-year-old is in the home alone or at least have a strong likelihood that the 9-year-old is in the home, checks with the neighbor, which is the only other place the 9-year-old could have been, and then comes back and goes in the home to check on the welfare of a 9-year-old who's unsupervised. This is different than a 30-year-old female who, I think we can infer, doesn't necessarily need supervision and doesn't want supervision. So the facts in this case, it's not a call for immediate assistance. It's a report to the police saying these are some of the things that are going on in my daughter's life, and I'm concerned, and it's okay for the mother to be concerned, but does that give the police officers the right to open a window and storm into the window of the hotel room? I think it boils down to that. Mr. O'Connell, would you like to keep some rebuttal time? Thank you. Mr. Tibby. Good morning, Your Honors. Your Honors, the basic foundation for this type of warrantless entry is that police have to be able to respond to emergency situations pursuant to their community caretaking functions. The appropriateness of the emergency doctrine, as is reflected in the Bradley case, has to be determined after looking at the facts and circumstances of each individual case. And when we look at the facts and circumstances of this cause, the conclusion has to be that those officers had no choice but to make entry into that hotel room. Well, I'm not so convinced of that. What is an emergency situation when they're expecting a possibility of suicide, that that's the emergency? Because drug use and prostitution doesn't seem to me to be that much of an emergency. What looks suicidal when the police observe a man in boxer shorts and a woman fully dressed and they're going into a bathroom? Suicide usually occurs alone. Right. How does that jive with the idea we're trying to prevent a suicide by climbing in the window? Please explain that to me. Your Honor, I believe the exigency probably would have had to be developed before the officers opened that window and pulled aside the curtain. And it's the totality of the circumstances that they were faced with. I have to respectfully disagree as far as the suicidal potential tendencies of Ms. Selke being the only factor. I believe that drug use, especially when Ms. Selke's mother had advised law enforcement officers that Ms. Selke was basically hallucinating, she was taking so many drugs, to the point that she asked her mother to come over and take her children away from her. All of that wasn't known to these policemen. All they had was three words, suicidal, drugs, and prostitution. Those are the three words. What about what they saw through the window can be reasonably concluded, and then I'm going to ask you what the reason is, as to why there was a threat of suicide by a fully dressed woman and a man in a box of shorts going from the hotel room where the television was on into the bathroom? Your Honor, I think there would be less of a concern at that point once the officers saw that. About what are they concerned? Suicide? Two people going into a bathroom? They're both going to suicide, or just she's going to suicide? That's what I'm saying, Judge. Once the officers looked into the room and saw a fully clothed woman and the man standing there, there was less likelihood, if any likelihood, that there was about to be a suicide there. But at that point, the officers were at risk themselves, which is why they went through that window. Well, what was the risk themselves? The people inside the hotel room weren't opening the door. Were the police at risk because they weren't opening the door? They were. Some security issue? They were at risk, Your Honor, because Ms. Eichinger fled to a part of the room where the officers couldn't see. In those circumstances, I believe officers always have to be concerned about their own safety, about someone going for a gun. They just had the prior circumstance where they were not only going for a gun,  Is that your argument? That's part of it, Judge. The other part of it was Sergeant Toma's observation that sometimes if there is a risk of suicide, persons do it by cop, suicide by cop. So besides cop, COP. Suicide by inducing the police to shoot. Correct. Exhibiting a weapon. Did both people going into a bathroom increase the risk that one of them is going to be shot by a cop? Mr. Allen didn't go into the bathroom, Your Honor. Only Ms. Eichinger did. And that was Sergeant Toma's testimony that he was concerned for those different officer safety reasons. Does the record tell us whether the observing officer at the window was observed by the people inside? There's no direct indication of that other than Ms. Eichinger fleeing to the back of the room, Judge. Other than what? Ms. Eichinger fleeing to the back of the hotel room and to the back bathroom. Okay. So it's clear she's fleeing, at least from the officer's perspective, she's fleeing from observing him as opposed to just going into the bathroom. Yes, Judge. This is a small room. Right. Where the officer just got done kicking on the door to the point that guests are coming out of other rooms this evening. They banged on the door, no one's answered, and now they open the window. Correct, Judge. They're observed. In a very small room, as the diagram that I submitted with my brief, Judge, shows that the window was right next to the door. Officers slide that open, pull back the curtain. There would be no way that they couldn't observe the police officer. I can picture that. Your Honor, the only other point I'd like to address is Mr. Hormel has put a lot of emphasis on the fact that this is a four-day-old report. I believe because you have to look at each case on its own merits, that doesn't necessarily resolve the issue at all. The question is whether there was an exigency as a result of the information that these officers had. These missing persons reports are a high priority with the Department. There was testimony by Sergeant Toma that once a crime check takes a missing person report, it was immediately faxed over to the records section and then displayed to officers out in the field on their computer screens. There were also follow-up done on these missing persons reports so they don't just languish in a file and they pop up six minutes later. At page 60 of the executive record, there was some testimony from a gentleman from the records section who talked about or testified concerning follow-up reports or follow-up contacts by the police to check out if the person still is a missing person. There was actually a subtle slip done on this case on the 15th, showing that the police were very diligent in following up on this missing person report. That's all I had, Your Honor. We appreciate it, Mr. Skibbe. Thank you for your argument. Mr. O'Malley. Unless the Court has any questions, stand on your turn. Let's see. Any questions? No, sir. We appreciate it. Thank you very much. United States v. Allen, Shelby County. Again, we thank counsel for traveling from eastern Washington to be here with us. Thank you. The Court will recess for ten minutes because we're setting up a video. All rise. This Court stands to recess for ten minutes.
judges: Canby, Gould, Bea